**Zack GREEN, Plaintiff-Appellee,**

**v.**

**Glenn DUMKE, Chancellor, California State Colleges, et al., Defendants-Appellants.**

**No. 71-1260.**

United States Court of Appeals, Ninth Circuit.

June 18, 1973.

---

Edward Belasco, Deputy Atty. Gen. (argued), Jeffrey C. Freedman, Deputy Atty. Gen., Los Angeles, Cal., for defendants-appellants.

Ernest L. Aubry (argued), Ralph M. Segura, Errol J. Gordon, of Western Center on Law and Poverty, Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before MERRILL, HUFSTEDLER and CHOY, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Green brought this civil rights action against the College and the named College Administrators[1] (hereafter collectively termed the "College"), claiming that the College's action in finding him ineligible for federal financial benefits deprived him of rights secured by the Fifth and Fourteenth Amendments for which he was entitled to declaratory and injunctive relief. Green lost federal grants and loans when the College determined that he was disqualified from receiving student benefits by his conduct on campus under the terms of section 504(a) of the 1968 Federal Higher Education Amendments (20 U.S.C. § 1060 (a)).[2] The district court held that the College has misconstrued section 1060(a), and that the hearing, which resulted in disqualification, did not satisfy

---

1. The Chancellor of the California State Colleges, the President, the Administrative Vice-President, and the Dean of Students of the College.

2. "If an institution of higher education determines, after affording notice and opportunity for hearing to an individual attending, or employed by, such institution, that such individual has been convicted by any court of record of any crime which was committed after October 16, 1968, and which involved the use of (or assistance to others in the use of) force, disruption, or the seizure of property under control of any institution of higher education to prevent officials or students in such institution from engaging in their duties or pursuing their studies, and that such crime was of a serious nature and contributed to a substantial disruption of the administration of the institution with respect to which such crime was committed, then the institution which such individual attends, or is employed by, shall deny for a period of two years any further payment to, or for the direct benefit of, such individual under any of the programs specified in subsection (c) of this section. If an institution denies an individual assistance under the authority of the preceding sentence of this subsection, then any institution which such individual subsequently attends shall deny for the remainder of the two-year period any further payment to, or for the direct benefit of, such individual under any of the programs specified in subsection (c) of this section."

due process. The district court granted Green's motion for summary judgment. On appeal the College contends (1) that the district court did not have subject matter jurisdiction; (2) that the district court misconstrued section 1060(a) to require specific intent; and (3) that the evidence adduced at the hearing adequately supported the College's decision.

This action grows out of a turbulent student meeting held on May 9, 1969, in the cafeteria of Mt. San Antonio College. Students were excused from class to permit them to debate the allocation of student funds to the athletic department and to the Black Student Union. The budgetary issue was an outcrop of racial tensions on the campus, and the atmosphere of the debate was volatile. A student chairman was selected to establish orderly access to the microphone. Green had been previously allocated microphone time to express the views of the Black Student Union. After the chairman recognized Green and as he approached the microphone, one of the students, Stute, who was waiting his turn, yelled "Don't let that nigger speak." The audience reacted with jostlings, shouting, and exchanges of obscenities and racial epithets. Green immediately responded by leaving the platform and by taking several swings at Stute. Fist fights then broke out throughout the hall and spilled over to adjoining areas. The meeting was stopped, and classes were canceled for the rest of the day. Green was later convicted in a court of record of battery for striking Stute.

Green transferred from Mt. San Antonio College to California Polytechnic College. On August 27, 1969, the College told him that he had been awarded $2400 in federal aid for the 1969–1970 academic year.[3] A month later, the Dean of Students notified him that the Dean had decided that the incident at Mt. San Antonio disqualified him from federal assistance under section 1060(a). A perfunctory hearing was held confirming the Dean's conclusion.

Green commenced this action pleading federal jurisdiction, *inter alia,* under 42 U.S.C. § 1983[4] combined with 28 U.S.C. § 1343.[5] While retaining jurisdiction, the district court ordered the College to conduct a new hearing. With a retired judge appointed by the College acting as hearing officer, the new hearing was held on August 13, 1970. The hearing officer found that Green had been convicted for battery after the effective date of section 1060(a), that the battery involved the use of force, that the battery "prevented officials or students of such institution [from] engaging in their duties and pursuing their studies," and that such a crime "was of a serious nature and contributed to a substantial disruption . . . at Mount San Antonio College." The College concluded that Green was ineligible for federal benefits.

Green filed a complete transcript of the second hearing and moved for summary judgment. The district court decided that the College had acted under color of law, that Green had been denied due process because there was no evi-

---

3. The sources were a State College Opportunity Grant, an Educational Opportunity Grant, a National Defense Loan, and a United States Work Study Grant.

4. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity, or other proceeding for redress."

5. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

". . .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. . . . ."

dence before the hearing officer to prove that Green's battery was of a "serious nature" within the meaning of section 1060(a) or to prove that Green had the requisite intent to prevent officials or students from engaging in their duties or pursuing their studies.

## I.

■ The College argues that it is immune from 42 U.S.C. § 1983 because, in conducting the hearing, the College was acting pursuant to federal law and not under color of state law. The College is too modest about its role and too restrictive in its reading of the section 1983 script.

In enacting section 1060(a) and in providing federal aid to state college students, Congress did not reduce the College to the status of a federal hireling. The College was a participant in a federal-state cooperative venture of a kind that is increasingly familiar. Its role is analogous to that of state agencies administering other kinds of federally funded or cooperatively funded, social programs such as the Aid to Families With Dependent Children (AFDC) program. The Supreme Court has repeatedly found federal jurisdiction for challenges to the activities of state agencies administering federal programs under 42 U.S.C. § 1983 combined with 28 U.S.C. § 1343. It has not mattered a ju-

risdictional whit that the agency was enforcing federal statutes, as well as pursuing state ends. (*E.g.,* Carter v. Stanton (1972) 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569; Townsend v. Swank (1971) 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed. 448; Dandridge v. Williams (1970) 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; Rosado v. Wyman (1970) 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442; Goldberg v. Kelly (1970) 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; King v. Smith (1968) 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118.[6]

■■ The "under color of law" component of section 1983 is the equivalent of the state action requirement of the Fourteenth Amendment (United States v. Price (1966) 383 U.S. 787, 794–795 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267) and it carries the same meaning as its criminal counterpart, 18 U.S.C. § 242. *E.g.,* Adickes v. S. H. Kress & Co. (1970) 398 U. S. 144, 152 n. 7, 90 S.Ct. 1598, 26 L.Ed. 2d 142; United States v. Price, *supra* at 794–795 n. 7, 86 S.Ct. 1152; Monroe v. Pape (1961) 365 U.S. 167, 185, 212, 81 S.Ct. 473, 5 L.Ed.2d 492. Recognizing these concepts as expansive,[7] the Supreme Court has persistently refused to permit them to be shriveled by technicalities drawn from private law doctrines or to be emasculated by unnatural, artificial interpretations.[8]

---

6. We live in an age of complex intergovernmental relations that were virtually unknown to the post-Civil War drafters of the Fourteenth Amendment and the Ku Klux Klan Act of 1871. Ours is a time of increasing cooperative and creative federalism marked by joint federal-state ventures in numerous aspects of economic and social life. Programs such as revenue sharing, crime control, health care, and social security have blurred any sharp lines of demarcation of governmental authority and responsibility that once may have existed.

7. Civil rights legislation should generally not be interpreted narrowly. Section 1983 was designed as comprehensive, remedial legislation for the deprivation of federal constitutional and statutory rights. Smith v. Hampton Training School for Nurses (4th Cir. 1966) 360 F.2d 577; Basista v.

Weir (3d Cir. 1965) 340 F.2d 74, 81. The contours of § 1983 must necessarily remain flexible to accommodate changing circumstances and the exigencies of a given era. Because it is remedial in nature, § 1983 is appropriately suited to redress any "new method of interference" with the rights which its words protect. "For it is the constitutional right, regardless of the method of interference, which is the subject of the statute and which in precise terms it protects from injury or oppression." United States v. Classic (1941) 313 U.S. 299, 324, 61 S.Ct. 1031, 1042, 85 L.Ed. 1368.

8. What is now 42 U.S.C. § 1983 originated as § 1 of the Ku Klux Klan Act of April 20, 1871. 17 Stat. 13 (R.S. § 1979). Designated as "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and

The College is a state institution. The state clothed it with authority to act; its officers and agents derived their authority to conduct the hearing from the College. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." (United States v. Classic, *supra,* 313 U.S. at 325–326, 61 S.Ct. at 1043; *see also* Monroe v. Pape, *supra,* 365 U.S. at 184, 81 S.Ct. 473; Williams v. United States (1951) 341 U.S. 97, 99, 71 S.Ct. 576, 95 L.Ed. 774; Screws v. United States (1945) 325 U.S. 91, 109, 112–113, 65 S.Ct. 1031, 89 L.Ed. 1495.)

Kletschka v. Driver (2d Cir. 1969) 411 F.2d 436, 447–449, is closely in point. A Veterans Administration doctor brought a civil rights action against federal and state officials seeking redress for interference with his employment rights. He alleged that Veterans Administration officials conspired with a state medical school to cause his transfer from the veterans' hospital and his loss of a research grant. The court re-versed summary judgment that had been awarded in favor of the state defendants, holding that the state officials acted under color of law. "When the violation is the joint product of the exercise of a State power and a non-State power then the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a 'significant' role in the result. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 722 [81 S.Ct. 856, 6 L.Ed.2d 45]. . . . " (411 F.2d at 449.)

The actions of state officials caused Green's loss, and they acted under color of state law. Federal jurisdiction was appropriately laid under section 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3). (*Cf.* King v. Smith, *supra,* 392 U.S. at 312 n. 3, 88 S.Ct. 2128; Wong v. Hayakawa (9th Cir. 1972) 464 F.2d 1282.)[9]

## II.

The College next contends that the district court misconstrued section 1060(a) when it decided that Green was not ineligible for benefits unless he com-

---

for other Purposes," it was one of the methods by which Congress exercised the power vested in it by § 5 of the Fourteenth Amendment. As the debates at the time disclose, Congress sought to effectuate three purposes in enacting § 1983: (1) to override certain kinds of state laws; (2) to provide a remedy where state law was inadequate; and (3) to afford a federal remedy where the state remedy, while adequate in theory, was not available in practice. *See* Cong.Globe, 42d Cong., 1st Sess. (1871) 268, 345, 365–66.

The sharp exchanges between proponents and opponents of the Act demonstrate that Congress was not placing a restrictive or unduly literal gloss on the phrase acting "under color of any statute." One of the legislation's supporters, Senator Edmunds, Chairman of the Senate Committee on the Judiciary, stated that it created a civil action to protect federal rights "assailed by any State law *or* under color of any State law." *Id.* at 568 (emphasis added). Congressman Perry understood § 1983 to remedy injuries done "under color of State authority." *Id.* at 79.

The comments concerning § 1983 at the time of passage and an understanding of the circumstances that prompted its enactment demonstrate that Congress envisioned a more expansive interpretation of the words "under color of any statute" than appellants' suggested construction. *See generally* Adickes v. S. H. Kress & Co., *supra,* 398 U.S. at 162–169, 183–184, 203–209, 90 S.Ct. 1598; Monroe v. Pape, *supra,* 365 U.S. at 171–183, 81 S.Ct. 473. The drafters were vividly aware that while many state laws did not compel racial discrimination or the deprivation of such rights as due process, the administration of a state's laws by its officers could effectively accomplish these ends. *E.g.,* Cong.Globe, 42d Cong., 1st Sess. (1871) 315, 334, 505. Consequently, § 1983 addressed not only abuses sanctioned by law, but also those committed by state officials or individuals who were in a position to perpetrate unconstitutional actions solely by virtue of the authority conferred upon them by the state government.

9. Because federal jurisdiction is thus secured, we do not reach the College's attacks on alternative bases of jurisdiction pleaded by Green.

mitted the battery for the purpose of disrupting campus activities. The statute provides that disqualification results from a determination by the College that a person "has been convicted . . . of any crime . . . which involved the use of . . . force . . . *to prevent officials or students in such institution*[*s*] *from engaging in their duties or pursuing their studies,* and that such crime was of a serious nature and contributed to a substantial disruption of the administration of the institution *with respect to which such crime was committed. . . .*" (Emphasis added.)

The College argues that the statute contains no provision for the specific intent element and that ineligibility is satisfied by proof that Green was convicted of battery, a crime involving force, and that his battery contributed to the disruption of the institution. The College's interpretation is unacceptable because it reads the italicized language out of the statute. The purpose of the statute, read contextually, was to withdraw federal aid from a student whose crime was committed to disrupt the institution, one whose crime was a kind of offense against the institution.

The legislative history of section 1060(a) is brief. Nothing in the history, however, suggests that Congress intended to reach offenses that had the unintended consequence of disruption. The statute was enacted during an era scarred by campus shootings, bombings, sit-ins, and shut-downs, and it was deliberately provocative conduct of that nature and gravity which Congress sought to discourage.[10] The Senate Report in-

dicates that Congress sought to reach such conduct as the "vicious willful destruction of property [that] occurred at Columbia University"; it was not attempting to withdraw financial aid from students exercising First or Fifth Amendment rights [11] or those who were guilty of "student pranks," even if the pranks also constituted a crime involving force. S.Rep.No.1387, *supra* note 10, at 4053.

We also agree with the district court that Green's offense was not a crime of a "serious nature" contemplated by Congress. Fist fights between male college students have long been a part of the undergraduate scene and are not generally considered serious; prosecutions are very rare. A fist fight cannot be escalated into a serious crime unless we can say that the aggressor intended to provoke consequences beyond his personal feud with his fellow student.

Finally, the College attacks the district court's conclusion that Green was denied due process because there was no substantial evidence before the hearing officer to support a finding (had one been made) on the essential intent element. It contends that intent could be inferred from the fact that disruption occurred after the fight. The principle that one is deemed to intend the natural and probable consequence of his intentional acts does not fit this case. Green reacted to fighting words. We cannot say that the audience responded more probably than not to Green's swing than to Stute's provocative language or, indeed, to the obscenities and epithets which the audience exchanged in an

---

10. "The committee has been dismayed and alarmed by evidence of student unrest on the college campuses of this country which has been outwardly evidenced by rioting, trespass and forceful interference with the administration of the colleges and with the activities of students who wish to pursue their studies. Such activity is not to be countenanced in a society such as ours. Peaceful picketing and free speech are treasured rights which must be protected but unlawful and violent conduct cannot be condoned." S.Rep.No. 1387, 90th Cong., 2d Sess. (1968); 1968 U.S.Code Cong. & Admin.News 4053.

11. "Nothing in this section shall be construed to limit the freedom of any student to verbal expression or individual views or opinions." 20 U.S.C. § 1060(d) (3). *See* Conference Report No. 1919, 90th Cong., 2d Sess. (1968); 1968 U.S. Code Cong. & Admin.News 4161.

emotionally charged atmosphere before Green left the platform.

The due process violation in this case stems from the conduct of the entire proceedings that contributed to a defective hearing process. *Cf.* Goldberg v. Kelly (1970) 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. The mistake of law committed by the hearing officer that resulted in no substantial evidence being adduced to support a finding of specific intent, and the subsequent action taken by the College in reliance upon the hearing officer's findings, violated due process and thereby conferred jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). *Cf.* Wong v. Hayakawa (9th Cir. 1972) 464 F.2d 1282, 1283; *see also* General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R. D. 133, 143, 147; Karp v. Becken (9th Cir. 1973) 477 F.2d 171 (dismissal of section 1983 action for violation of First Amendment rights of suspended high school student reversed since *no evidence in record to justify suspension*).

Affirmed.