Charles CORR and Donily Ranns

v.

Duane J. MATTHEIS, acting U. S. Commissioner of Education, et al.

Civ. A. No. 74–53.

United States District Court, D. Rhode Island.

Jan. 20, 1976.

Seth K. Gifford, Providence, R.I., for plaintiffs.

Lincoln C. Almond, U. S. Atty. and Constance Messore, Asst. U. S. Atty., Providence, R.I., for defendant Mattheis.

Julius C. Michaelson, Atty. Gen., R.I., Gregory C. Benik, Sp. Asst. Atty. Gen., R.I., Providence, R.I., for defendant R.I. Bd. of Regents.

## OPINION

Before McENTEE, Circuit Judge, PETTINE, Chief Judge, and BOWNES, District Judge.

PETTINE, Chief Judge.

### Findings of Fact

During the early morning hours of May 17, 1972, a group of approximately 19 student protestors, including the plaintiffs, Charles Corr and Donily Ranns, and another two to three non-students, were removed from the ROTC offices on the campus of the University of Rhode Island by uniformed members of the URI campus police. Aside from their singing and chanting, the protestors' removal was effected without incident and marked the end of their eight-

day occupation of the URI–ROTC offices to protest the United States' presence in Viet Nam.

According to Paul Brubacher, URI Dean of Students, the student group had been permitted to occupy the ROTC offices without disturbance or reprisal on the condition that they did not prevent the ROTC personnel from carrying out their duties. During the first seven days of the occupation, this condition had been observed, the protestors constituting no more than an "annoying" presence. However, on the morning of the eighth day, May 17, protestors blocked the entrances to the ROTC offices, forcing ROTC personnel to step over them. Other students sat in office chairs, lounged across desk tops and on top of filing cabinets, thereby obstructing access to files and work areas. When asked by ROTC personnel to move, they simply refused. ROTC personnel thereupon left and reported the situation to the Dean of Students. Concluding that the condition under which the occupation initially was allowed had been broken, Dean Brubacher notified the students to leave the ROTC offices. When they refused to do so, he summoned the campus police and the protestors were removed. In his words, it was "at all times a peaceful demonstration."

By individual letter of May 22, 1972, Dean Brubacher notified each of the plaintiffs that the University had instituted disciplinary proceedings against them and that their cases would be heard by the URI Student Conduct Board (formally known as "Board on Student Conduct and Scholastic Integrity") on May 31, 1972. A copy of the charges against them was sent with the notice and is reproduced in full in the appendix to this Opinion. In essence, plaintiffs were claimed to have "individually and acting in concert as a group" engaged in "disruptive activity" which constituted a violation of specified criminal laws of Rhode Island pertaining to disorderly conduct, disturbance of public assemblies and trespass:

"[S]pecifically on May 17, 1972, they denied ROTC faculty and staff members the lawful use of their offices and facilities; they willfully impeded ROTC faculty and staff members from the lawful performance of their duties by obstructing, disrupting, and interfering with the lawful missions, processes, procedures, and functions of that office and of the University."

Upon a finding of guilt by the Conduct Board, the Board was empowered to affix a penalty consonant with its constituting legislation. The full range of penalties within the Board's power was not presented to the Court, but included suspension and discipline short of suspension. It did not include termination of federal financial aid.

At the students' request, the hearing was postponed until September 18, 1972, at the beginning of the Fall Semester. After two further postponements, the hearing was held on October 3, 1972. Of the original group charged, plaintiff Ranns and two former students did not attend.[1] At the hearing, Dean Brubacher read the charges[2] (see appendix), which were substantiated by ROTC personnel. None of the students disputed the factual presentation. At the Board's request, Dean Brubacher recommended as an appropriate penalty that each of the students be placed upon a modified form of disciplinary probation for the Fall Semester. On the spectrum of student discipline, disciplinary probation is

1. At trial, the litigants focused much attention upon the adequacy of notice given to plaintiffs that the Conduct Board hearing had been postponed to October 3, 1972. This issue is simply not material in view of the Court's conclusion, developed *infra*, that the Conduct Board inquiry did not, in any event, accord plaintiffs due process on the issue of termination of their federal financial aid. Whether this notice or indeed whether any aspect of the proceedings before the Conduct Board was constitutionally sufficient, insofar as student discipline was concerned, is not at issue in this case and we do not pass upon it.

2. Under Conduct Board regulations, neither the University nor the charged student is permitted to have legal counsel present.

one step short of suspension. The Board concurred. Plaintiffs were formally notified of the Board's decision by individual letter of October 12, 1972.

Sometime in mid-November, 1972, the URI Director of Student Aid began to explore the possibility that plaintiffs, who were then receiving federal financial aid, were disqualified from receiving further federal assistance by § 305 of the Office of Education Appropriation Act, 1972, Pub.L. 92–48, 85 Stat. 103 (7/9/71), and § 407 of the Departments of Labor and Health, Education, and Welfare Appropriation Act, 1972, Pub.L. 92–80, 85 Stat. 285 (8/10/71), which in identical language provide:

"No part of the funds appropriated under this Act shall be used to provide a loan, guarantee of a loan, a grant, the salary of or any remuneration whatever to any individual applying for admission, attending, employed by, teaching at, or doing research at an institution of higher education who has engaged in conduct on or after August 1, 1969, which involves the use of (or the assistance to others in the use of) force or the threat of force or the seizure of property under the control of an institution of higher education, to require or prevent the availability of certain curriculum, or to prevent the faculty, administrative officials, or students in such institution from engaging in their duties or pursuing their studies at such institution."

An identical restriction has been incorporated in every yearly Labor/HEW appropriation act enacted since March 1970 and is hereinafter referred to as "§ 407." *See, e. g.*, Departments of Labor and Health, Education, and Welfare Appropriation Acts: 1970, Pub.L. 91–204, Tit. 4 § 407, 84 Stat. 23 (3/5/70); 1974, Pub.L. 93–192, Tit. 4 § 407, 87 Stat. 746 (12/18/73); 1975, Pub.L. 93–517, Tit. 4 § 406, 88 Stat. 1634 (12/7/74); 1976,

Pub.L. 94–206, Tit. 4 § 405, 90 Stat. 3 (1/28/76).

Pursuant to the agreement between URI and HEW governing the availability of federal financial assistance programs at URI, URI had the primary responsibility to ensure that the terms of § 407 were observed. Upon inquiry of the Office of Education of HEW, the URI Director of Student Aid was advised that:

"It appears that the University has complied with [HEW's] requirements for fair notice of proposed cessation of payments and has given the students [plaintiffs] an opportunity to be heard as to whether they engaged in conduct included under the provisions of section 407."

Based upon this advice, the report of an internal auditor concluding that § 407 applied, and the report and proceedings before the Conduct Board, and with the concurrence of the President of URI, the URI Director of Student Aid concluded that plaintiffs Corr and Ranns were no longer eligible for federal financial aid and informed them in January 1973 that:

"[Y]our federal financial aid from this time forward must cease and [your ineligibility will continue for] as long as these Sections [305 and 407] continue to be included in the [pertinent appropriations] legislation."

Up to the moment of this notification, plaintiffs were unaware that the University was considering termination of their federal aid in response to their activities on May 17, 1972.[3]

For the remainder of the 1972–73 academic year, the University replaced plaintiffs' lost federal aid with nonfederal assistance. Plaintiffs received federal assistance in 1973–74 because the University believed Congress had not reenacted § 407, but URI once again terminated federal aid for 1974–75, plaintiffs'

---

**3.** Plaintiffs had been advised during the course of the demonstration that under certain circumstances their occupation of the ROTC offices might jeopardize their future eligibility for federal financial aid. The Court fails to see how such awareness, or lack thereof, affects the issue of the constitutional sufficiency of the procedures employed to terminate plaintiffs' federal aid.

senior year. Plaintiff Corr was accepted to the masters program of the URI Department of Economics for 1975–76, but could not enroll because he could not secure financial assistance. Federal financial aid was not available due to § 407. He is presently unemployed. Plaintiff Ranns testified that she is likewise unable to pursue graduate studies due to her ineligibility for federal assistance. It is undisputed that, but for § 407, both plaintiffs presently meet all eligibility requirements for federal financial assistance and that their ineligibility will continue so long as the language of § 407 is incorporated in successive appropriation acts.[4]

### Conclusions of Law

In an effort to remove this perpetual disability, plaintiffs commenced this action for declaratory and injunctive relief against various officials of URI and the State Board of Regents, who act under color of state law, 42 U.S.C. § 1983, R.I. G.L. § 16–31–5, and against the Acting United States Commissioner of. Education, claiming that § 407 violates the Due Process Clause of the Fifth and Fourteenth Amendments and the free speech and assembly provisions of the First Amendment to the United States Constitution. Since the action challenged the constitutionality of a federal statute, a three-judge court was convened. 28 U.S.C. §§ 2282, 2284. In a separate memorandum and order, the author, sitting as a single judge, conclud-

ed that jurisdiction was conferred upon the Court by 28 U.S.C. §§ 1331, 1343, 2201, 2202.

The Court has no occasion to consider plaintiffs' challenge to § 407 as "overbroad" in violation of the First Amendment, or as "void for vagueness" in violation of the Due Process Clause,[5] since plaintiffs must prevail on the preliminary constitutional issue that the termination of their federal financial aid pursuant to § 407 was not in accordance with the minimum procedures required by the Due Process Clause.

It does not require extensive discussion to conclude that the deprivation of financial aid mandated by § 407 must be preceded by fundamentally fair procedures of "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). Plaintiffs' "legitimate claim of entitlement" to receive federal financial assistance for the full academic year 1972–73 was abruptly terminated at the end of the Fall Semester by application of § 407. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs, still otherwise eligible for federal financial aid, continue to be denied a "property" interest vital to the continuation of their education, an interest which Congress deemed of great importance to the national interest in establishing programs for federal financial aid to higher education in the first place.[6] The impor-

---

4. The restrictions in § 407 not only apply to student financial aid but also to any federal grants, salary or remuneration going to persons "employed by, teaching at, or doing research at an institution of higher education." Thus, plaintiffs would not be able to obtain such employment so long as § 407 is reenacted.

5. *See generally Undergraduate Student Association v. Peltason*, 367 F.Supp. 1055 (N.D.Ill. 1973) (three-judge court); *Rasche v. Board of Trustees of University of Illinois*, 353 F.Supp. 973 (N.D.Ill.1972) (three-judge court); *Corporation of Haverford College v. Reeher*, 329 F.Supp. 1196 (E.D.Pa.1971) (three-judge

court). *Cf. Green v. Dumke*, 480 F.2d 624 (9th Cir. 1973); *Kister v. Ohio Board of Regents*, 365 F.Supp. 27 (S.D.Ohio 1973) (three-judge court), aff'd mem., 414 U.S. 1117, 94 S.Ct. 855, 38 L.Ed.2d 747 (1974).

6. The federal aid at issue is authorized under 20 U.S.C. §§ 421–429 (National Defense Loans to Students in Institutions of Higher Learning); 20 U.S.C. § 1070 et seq. (Educational Opportunity Grants); and 42 U.S.C. §§ 2751–2756a (Work Study Programs). Any student who meets the eligibility requirements is statutorily entitled to the benefits provided under these programs. *See* 20 U.S.C. §§ 425, 1070a, 1070b–1, 1070b–2, 42 U.S.C. § 2754.

tance of education to the individual student and to government was also recognized by the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and recently reaffirmed in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A review of the Supreme Court's analysis in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), of the severity of the deprivation accomplished by termination of welfare benefits produces striking similarities to the present deprivation, albeit in the more limited context of higher education. To paraphrase *Goldberg, supra* at 265, 90 S.Ct. 1011, federal financial aid to higher education can help bring within the reach of the poor and economically needy the same educational opportunities that are available to others to participate meaningfully in the life of the community. *See also* 20 U.S.C. § 401, quoted in note 6, *supra*.

 In addition, termination of federal aid pursuant to § 407 must be based upon a finding of serious misconduct involving the threat or actual use of force, or seizure of property, and, as a result, implicates plaintiffs' right not to be denied liberty, including "a person's good name, reputation, honor, or integrity," *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), without due process of law. *See, e. g. , Goss v. Lopez, supra*, 419 U.S. at 574–575, 95 S.Ct. 729;[7] *Board of Regents v. Roth, supra*, 408 U.S. at 572–575, 92 S.Ct. 2701; *Wisconsin v. Constantineau, supra*. Notice and full prior hearing must ordinarily be provided where the challenged governmental ac-

Congress' intent in enacting the National Defense Education Program is stated in 20 U.S.C. § 401 and includes the following declaration:
"The Congress finds and declares that the security of the Nation requires the fullest development of the mental resources and technical skills of its young men and women.

\* \* \* \* \* \*

We must increase our efforts to identify and educate more of the talent of our Nation. This requires programs that will give assurance that no student of ability will be denied an opportunity for higher education because of financial need."

tion imposes upon the individual "a stigma or other disability that foreclose[s] his freedom to take advantage of other . . . opportunities." *Board of Regents v. Roth, supra* at 573, 92 S.Ct. at 2707. It is hard to imagine a better example than the present case to illustrate this statement. Section 407 by its own terms both impugns the reputation of the individual to whom it is applied and provides for his indefinite exclusion from federally funded educational and employment opportunities. *See* notes 4, 7, *supra*.

Neither the state defendants nor the federal defendant disputes plaintiffs' right to minimum due process before financial aid can be terminated under § 407. Nor do they take issue with the proposition that the process due in this case must be fashioned along the lines of the Supreme Court's analysis in *Goldberg v. Kelly, supra*, 397 U.S. at 266–271, 90 S.Ct. 1011; that plaintiffs must be given notice of the proposed cessation of payments pursuant to § 407 and an opportunity to be heard prior to termination. Indeed that has always been the informal position of HEW. It is the defendants' position, however, that the proceedings before the URI Conduct Board constituted sufficient notice and hearing.

 A brief review of the facts refutes this contention beyond doubt. The plaintiffs were not given any notice of the proposed cessation of federal aid under § 407 prior to termination in January 1973. The URI Director of Student Aid testified he had not even considered the possible application of § 407 to plaintiffs' May 17 activities until approximately a month and a half after the

*See also* 20 U.S.C. § 1070, 42 U.S.C. § 2751.

7. The Supreme Court's observation in *Goss, supra* at 575, 95 S.Ct. at 736, that charges of misconduct could "interfere with later opportunities for higher education and employment" (footnote omitted), is dramatically portrayed here by the cloud cast upon plaintiffs' academic futures which accompanied the initial finding of ineligibility under § 407. *See* note 4, *supra*.

Conduct Board met on October 3, 1972. The notice and charges for that Board hearing made no reference to federal financial aid; indeed it is far from clear that plaintiffs' conduct, as alleged in the charge, falls within the terms of § 407.[8] Cf. *Rameaka v. Kelly*, 342 F.Supp. 303, 309 (D.R.I.1972).

"Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.'" *In re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967) (footnote omitted).

Lastly, it was not within the Student Conduct Board's jurisdiction to determine the applicability of § 407 or to terminate plaintiffs' federal aid.[9]

The Court therefore concludes that the defendants' application of § 407 to disqualify plaintiffs from eligibility to receive federal financial aid did not conform to the minimum requirements of the Due Process Clause of the Fifth and Fourteenth Amendments. The terms of § 407 cannot constitutionally be applied to disqualify an individual from initial eligibility or to require a cessation of payments to one previously found eligible unless the individual has first been given notice of the proposed action and a meaningful opportunity to contest the applicability of § 407 to him. Since a very serious "liberty" as well as a substantial "property" interest is implicated in a finding of ineligibility under § 407, fundamental fairness requires that the charged individual be afforded adequate time to prepare his position between notice and hearing, see, e. g., *Sarzen v. Gaughan*, 489 F.2d 1076, 1086 (1st Cir. 1973); and that the individual be able "to appear personally with or without counsel before the official who finally determines continued eligibility[,] . . . present evidence . . . [and] confront [and] cross-examine adverse witnesses." *Goldberg v. Kelly*, supra, 397 U.S. at 268, 90 S.Ct. at 1021. See also *Greene v. McElroy*, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), quoted in *Goldberg v. Kelly*, supra, 397 U.S. at 270, 90 S.Ct. 1011. This is not to say that the hearing officer need be the Director of Student Aid. Finally, "the decision maker [must] state the reasons for his determination and indicate the evidence he relied on . . . [T]hough his statement need not amount to a full opinion or even formal findings of fact and conclusions of law", *Goldberg v. Kelly*, supra at 271, 90 S.Ct. at 1022, it will not suffice to rest a finding of ineligibility upon a simple recitation of the words contained in § 407. The economic and personal consequences attached to

---

**8.** Whereas the University charge speaks of a willful obstruction and disruption of the ROTC offices so as to impede ROTC personnel from performing their duties, § 407 focuses on conduct which involves the threat of or actual use of force or seizure of property to prevent University personnel from performing their duties. The two concepts are not identical. One who passively positions himself so as to obstruct or impede passage by others will not always attempt to secure his position by threatening harm to those who seek to bypass or remove him. Cf. *Arbeitman v. District Court of Vermont*, 522 F.2d 1031 (2d Cir. 1975). Similarly, such an obstruction may not involve the "seizure" of property at all.

In this case plaintiffs' peaceful occupation of the ROTC offices was initially permitted by URI. Whether or not the protest group's violation of URI's condition of nonobstruction rendered their action a "trespass ab initio,"

there is every indication that plaintiffs never employed force or the threat of force either against anyone or to obtain or retain their position in the ROTC offices. Cf. *Rasche v. Board of Trustees*, supra. Despite our doubts as to the applicability of § 407 to this activity, we do not decide whether the spirit or letter of § 407 applies, since plaintiffs clearly have a right to have that issue resolved in accordance with minimum due process procedures. For the legislative history of the predecessor to § 407, see S.Rep.No.1387, 90th Cong. 2d Sess. (1968) in 1968 U.S.Code Cong. & Admin.News, p. 4053.

**9.** We would also note in passing that the informal Conduct Board proceedings, in prohibiting the presence of legal counsel, would not provide minimum due process safeguards for a § 407 pre-termination hearing. See *Goldberg v. Kelly*, supra, 397 U.S. at 270, 90 S.Ct. 1011.

such a finding are simply too great to permit a mere parroting of the statute. *Cf. Raper v. Lucey*, 488 F.2d 748, 753 (1st Cir. 1973). "And, of course, an impartial decision maker is essential." *Goldberg, supra*, 397 U.S. at 271, 90 S.Ct. at 1022. *Cf. Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

It follows that plaintiffs are entitled to a declaration that the finding of their ineligibility to participate in federal programs covered by § 407 was unconstitutionally made and is void. They are also entitled to an injunction requiring the defendants to excise from all records in their custody or control [10] any reference to proceedings and rulings by which plaintiffs were found ineligible for federal financial aid, leaving extant any independent reference to school disciplinary proceedings which are not the subject of this suit.

## APPENDIX

On the morning of Wednesday May 17, 1972, 19 students (there were also 3 non-students involved who will be handled separately) whose names follow individually and acting in concert as a group willfully denied members of the ROTC faculty and staff lawful use of the property and facilities of the ROTC offices at the University of Rhode Island.

[The names of the 19 students, which appear after the first paragraph of the charges, are omitted.]

These students engaged in disruptive activity by denying the ROTC faculty and staff members the lawful use of their offices and facilities; they willfully impeded ROTC faculty and staff members from the lawful performance of their duties by obstructing, disrupting, and interfering with the lawful missions, processes, procedures, and functions of that office and of the University.

On the morning of Wednesday May 17, 1972, I and other members of the University staff witnessed the above mentioned students obstructing the doorways to the ROTC offices, sitting in the chairs behind ROTC staff desks, sitting and lying on the ROTC staff desks, and sitting on the file cabinets and the floor of these offices. In accordance with instructions given to me by the President of the University, I informed the students that if in any way they obstructed or interfered with the normal operation of these offices, they would be escorted from those offices. When members of the ROTC faculty and staff made an effort to perform their lawful duties, they were impeded from doing so by these 19 students. At this point, I notified the students that if they did not leave the two ROTC offices in 5 minutes the campus police would be called in to escort them out of the building. The students did not leave the offices as requested, the campus police were called, and it was necessary to carry all but one of the students from the building.

Under General Laws of the State of Rhode Island, the Board of Regents is empowered to 'hold and operate' the property of the University, including the ROTC offices. The President of the University is the Regents' authorized general agent on this campus and is required to protect University property and its operation against unlawful conduct on the property which interferes with the mission of the University or its parts. The disruptive activity described above which occurred on University property is contrary to the laws of the state of Rhode Island including but not limited to the following statutes: Section 11–11–1, Section 11–11–4, and Section 11–44–1. In directing me to intervene in the disruptive activity ongoing in the ROTC offices, the President was exercising his responsibility to protect University property and its operation.

---

**10.** The documents introduced into evidence reveal that officials at URI advised at least one trust company, not a party to this action, of plaintiffs' ineligibility by virtue of § 407. As to all such records not in their custody or control for which they supplied pertinent information, defendants are required to augment that information with the results of today's decision.

Moreover, on May 3, 1971, in a letter to the University of Rhode Island community, the President noted that on September 14, 1970 the Faculty Senate had adopted a resolution requesting 'the responsible authority' to 'take all appropriate action necessary' in connection with disruptive activity. The conduct described above was judged to be disruptive within the terms of this letter in that it involved an obstruction and interference in the ROTC offices and the action taken by me was and is appropriate and necessary.

In the University manual, Section 6.14.14 states that 'if a formal protest or demonstration is held, it shall not be confined to a specific area, but persons, or signs or other devices used to express the protest shall not block sight, hearing, access or egress, or otherwise interfere with the orderly conduct of the event being protested or of normal University activities'. This section deals specifically with 'controversial persons' but the spirit of these guidelines encompasses any formal protest by implication. The protest in question did involve persons blocking access and interfering with the orderly conduct of normal University activities.

I ask that the Board on Student Conduct and Scholastic Integrity hear this case involving 19 students who are charged with disruptive activity; specifically on May 17, 1972, they denied ROTC faculty and staff members the lawful use of their offices and facilities; they willfully impeded ROTC faculty and staff members from the lawful performance of their duties by obstructing, disrupting, and interfering with the lawful missions, processes, procedures, and functions of that office and of the University.

Respectfully submitted
s/ Paul W. Brubacher
Paul W. Brubacher
Dean of Students
5/22/72